Exhibit A

| | |
|---|---|
| ☐ Small Claims ☐ County Court ☒ District Court<br>☐ Probate Court ☐ Juvenile Court ☐ Water Court | DATE FILED: July 31, 2018 2:28 PM<br>FILING ID: 52F6067860664<br>CASE NUMBER: 2018CV31214 |
| DISTRICT COURT, JEFFERSON COUNTY, STATE OF COLORADO<br>100 Jefferson County Parkway<br>Golden, CO 80401 | |
| **Plaintiff: 44th Avenue Holdings, LLC, a Colorado limited liability company**<br><br>v.<br><br>**Defendant: Auto-Owners Insurance, a Michigan corporation** | ▲COURT USE ONLY▲ |
| Attorneys for Plaintiff:<br><br>Patrick D. Vellone, #15284<br>Jennifer E. Schlatter, #30626<br>ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.<br>1600 Stout St., Suite 1100<br>Denver, Colorado 80202<br>Phone Number: (303) 534-4499<br>E-mail: pvellone@allen-vellone.com<br>E-mail: jschlatter@allen-vellone.com | Case Number:<br><br>Division/Courtroom: |
| **COMPLAINT** | |

Plaintiff, 44th Avenue Holdings, LLC, by and through undersigned counsel, hereby submits the following Complaint against Auto-Owners Insurance.

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff 44th Ave. Holdings, LLC ("44th Avenue" or "Plaintiff") is a Colorado limited liability company with its principal place of business as 7100 West 44th Avenue, Wheat Ridge, CO 80033.

2. Defendant Auto-Owners Insurance ("Auto-Owners" or "Defendant") is a Michigan corporation, licensed and authorized to transact business within the State of Colorado.

3. Jurisdiction is proper in the Colorado District Courts pursuant to C.R.S. § 13-1-124, because the actions giving rise to the Complaint took place in Colorado and the parties transact business in the State of Colorado.

4.      Venue is proper in Jefferson County pursuant to C.R.C.P. 98(c).

## GENERAL ALLEGATIONS

5.      44th Avenue is the owner of an office building located at 7100 W. 44th Ave., Wheat Ridge, CO 80033 (the "Property"). The Property consists of two floors.

6.      Beginning in or around, the beginning of 2018, 44th Avenue commenced renovations on the Property, which renovations included a new roof and substantial interior work.

7.      44th Avenue has insured the Property at all times since 2017 with a Commercial Property and Commercial General Liability Policy issued by Auto-Owners, Policy No. 74-418641 (the "Policy"). The Policy is in effect from September 9, 2017 through September 29, 2018.

8.      Under the Policy, Auto-Owners agreed to pay for direct physical loss of or damage to the Property caused by or resulting from direct physical loss, unless otherwise limited or excluded by the Policy.

9.      Although the Policy initially included an exclusion for water damage resulting from an overflowing sewer or drains, the Policy is subject to the terms of an endorsement for Water Back-Up from Sewers or Drains that was purchased by 44th Avenue (the "Endorsement"). The Endorsement removes the exclusion relating to "Water," and provides coverage for loss or damage caused by water back-up from sewers or drains.

10.     In addition, 44th Avenue purchased additional coverage relating to a collapse event. Specifically, the Policy requires Auto-Owners to pay for direct physical loss or damage to the Property "caused by abrupt collapse of a building or any part of a building that is insured…" that was caused by, *inter alia*, "use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation." The collapse coverage also covers building decay that is hidden from view.

11.     44th Avenue paid the premiums due under the Policy at all relevant times and has performed all of its obligations under the Policy.

12.     Auto-Owners did not attempt in good faith to effectuate a prompt, fair and equitable settlement of 44th Avenue's claims.

13.     Auto-Owners' conduct described herein was willful and wanton and done heedlessly and recklessly without regard to the consequences to its insured, 44th Avenue.

14.     Auto-Owners knew or should have known that its actions as described herein were unreasonable and in bad faith.

15.     44th Avenue has suffered significant damages as a result of Auto-Owners' conduct including, but not limited to, the amount of damages necessary to repair/remediate the problems set forth in the claims, out-of-pocket payments made therefor, attorneys fees, costs and interest.

**AUTO-OWNERS INSURANCE CLAIM NO. 1**

16.     On or around May 3, 2018, a flood occurred at the Property from rainwater. The cause of the flood has not been determined, but it is believed to be due to several possible contributing factors. Specifically, a new roof had been installed on the building and the new roof was pitched such that all water would drain to the back of the building. However, the roofer had not yet installed gutters. In addition, there is a sump pump located at the back of the building which failed to operate. Finally, rainwater flowed on the ground of the parking lot and into an exterior drain, which overflowed.

17.     Thus, rainwater flowed from the roof, and as there were no gutters, the rainwater flowed down the back the building. The water from the exterior of the building converged with the rainwater that overflowed from the drain to the back of the building where the sump pump was located. As a result, the overflow of the rainwater seeped through the back door of the Property, and through windows at the back of the building, causing interior damage.

18.     On May 4, 2018, 44th Avenue timely filed a claim with Auto-Owners (Claim No. 1). On the same day, Korrie Cole, an insurance adjuster with Auto-Owners, left a voice mail for Jane Stetson, a principle of 44th Avenue. Ms. Stetson left several voice mails and sent emails in an effort to schedule a time for Ms. Cole to inspect the building and assess the damages.

19.     Ms. Cole eventually responded and initially scheduled the inspection for May 5, 2018. In a follow-up email, Ms. Cole stated that she would not be able to conduct the inspection until May 15, 2018.

20.     On May 9, 2018, Ms. Cole contacted Ms. Stetson and informed her that Auto-Owners would not be conducting an investigation, but would instead be denying the claim, and therefore an investigation was not required. Ms. Cole informed Ms. Stetson stated that the reason for the denial was that the flood was caused by surface water, which is excluded under the Policy.

21.     After speaking with Ms. Cole, Ms. Stetson contacted her insurance broker Aaron Ellsworth with Jewell Insurance. Ms. Stetson informed Mr. Ellsworth that Auto-Owners denied 44th Avenue's claim.

22.     On May 10, 2018, Mr. Ellsworth contacted Auto-Owners and demanded a meeting to discuss the denial of the 44th Avenue's claim, as well as to demand that Auto-Owners inspect the damage to the Property. Ms. Cole agreed to meet with Mr. Ellsworth on May 15, 2018 at the Property.

23. Even though Ms. Cole had agreed to meet Mr. Ellsworth for purposes of inspecting the Property, on May 11, 2018, Ms. Cole, on behalf of Auto-Owners, issued a denial of coverage letter to 44th Avenue.

24. In denying coverage, Auto-Owners relied upon the "water" exclusion, which is defined as "flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm)."

25. The May 11 letter stated:

> [p]er our investigation, while the interior of your property is considered covered property, the building or structure must first sustain damage from a covered cause of loss that would then have allowed the water to seep in causing the interior damages. The water that [sic] ran down the exterior wall of your building and leaked in through the windows, and the surface water that ran underneath the back door of your property, overflowing from an exterior drain; the building did not first sustain damage from a covered cause of loss that then allowed the water to leak in through the windows and back door, therefore there is no coverage for the interior damages resulting from these water intrusions. Additionally, there is an exclusion for surface water and the water that overflowed from the exterior drain and across the asphalt parking lot and underneath your back door is considered surface water.

26. Even though the letter referenced an "investigation," no such investigation of the Property had occurred prior to the May 11 date of the letter. Therefore, the letter constitutes a misrepresentation of the facts.

27. On May 15, 2018, Mr. Ellsworth met Ms. Cole at the Property. They met in the parking lot and walked around to the back of the building to inspect the sump pump. Ms. Cole took pictures of the sump pump and the hose that led to the west of the building. She then conducted an inspection of the interior of the building to assess the damage. Based upon the inspection, it was believed that one of the interior units in the back of the building had sustained the majority of the damage.

28. After the inspection, Mr. Ellsworth and Ms. Cole discussed the difference between storm water drain back-up verses surface water. Ms. Cole's stated that the rainwater that caused the damage is considered surface water. Ms. Cole further indicated that coverage under the Policy would only be triggered if the rainwater had come through the pipes of the sump pump and damaged the interior of the building.

29. The grounds offered by Auto-Owners for the denial of coverage are contrary to the express provisions of the Policy.

30. Improper diversion of the water into the foundations of the Property, via the actions of the construction professionals, an overflowing drain, and a failed sump pump, changed the nature of any natural surface water and, therefore, took the water outside the surface water exclusion.

31. In addition, coverage pursuant to the Endorsement was triggered as a result of the overflowing drain that contributed to the loss.

32. No further communications were received from Auto-Owners relating to Claim No. 1.

33. Auto-Owners failed to conduct a proper and otherwise sufficient investigation of the Property following the filing of Claim No. 1.

34. In denying Claim No. 1, Auto-Owners ignored the coverage provided for by the Endorsement and denied 44th Avenue's claim based upon other policy provision inapplicable to the claim for coverage, and intentionally failed to take into consideration the Endorsement.

35. By denying Claim No. 1, 44th Avenue incurred substantial out-of-pocket costs to mitigate the damage caused by the flood.

**AUTO-OWNERS INSURANCE CLAIM NO. 2**

36. On May 21, 2018, furniture was being moved into the building. Ms. Stetson stopped by the Property to check the progress. She was informed by the furniture installer that during the course of moving the furniture, something in the structure had suddenly cracked or broken under the second floor. As a result, no load was allowed to be put in the area. In fact, the area of the floor where the damage occurred had moved and was sagging. It was determined that three trusses below the floor had suddenly broken. Prior to the sudden structural damage, carpet had been installed and there had been no problems with the structure.

37. The following day, on or around May 22, a fourth truss broke causing further sagging and movement of the floor. Joe Zanone, the Project Manager for the remodel, informed Ms. Stetson that the floor was not safe. Mr. Zanone further stated that if the damage was not immediately repaired, there would be further damage caused to the building. The project's General Contractor likewise informed 44th Avenue that it was imperative to repair the damage immediately.

38. On May 22, 44th Avenue retained the services of a structural engineer that determined four trusses had been damaged, and that the damage was done either to the top cord or the bottom cord. The cause of the damage was not known, but appeared to have been resulted from over-loading.

39. On May 29, 2018, 44th Avenue was provided an estimate as to the cost to repair the broken trusses. That same day, Ms. Stetson contacted Mr. Ellsworth and requested that he file a claim with Auto-Owners. Ms. Stetson further informed Mr. Ellsworth that it was urgent that the

damage be mitigated otherwise additional damage to the building was likely to occur. That same day, Mr. Ellsworth submitted a claim to Auto-Owners on behalf of 44th Avenue (Claim No. 2).

40. On May 30, 2018, Ms. Stetson received a message from Dani Galaviz, the adjuster for Claim No. 2. Ms. Stetson returned the call but was unable to reach Ms. Galaviz. Ms. Stetson attempted to reach Ms. Galaviz multiple times that day, leaving multiple message. In the message, Ms. Stetson stressed the urgent nature of the claim.

41. On May 31, 2018, Ms. Stetson again attempted to reach Ms. Galaviz, leaving multiple messages. Ms. Stetson reiterated the urgent nature of the claim.

42. On June 1, 2018, Ms. Stetson received a voice mail from Ms. Galaviz. Ms. Stetson attempted to call her back and was again unable to reach her.

43. Due to Auto-Owners' failure to promptly respond to 44th Avenue's communications, and due to the dangerous and immediate nature of the damage, 44th Avenue determined it was necessary, in order to preserve the Property, to initiate the repairs. In addition, pursuant to the Policy, 44th Avenue is required to take all reasonable steps to protect the Property from further damage.

44. Mindful of the immediate danger to the Property, Ms. Stetson contacted her General Contractor on the project, CODA Construction, to request that repairs to the Property commence. Ms. Stetson further documented the damage with photographs, and kept a record of all expenses necessary to protect the Property, again as required by the Policy.

45. On June 4, 2018, Ms. Stetson left Ms. Galaviz additional messages. In the message, Ms. Stetson again informed Ms. Galaviz of the immediate nature of the damage. She provided Ms. Galaviz the contact information for the structural engineer, and further informed Ms. Galaviz she would forward the information documenting the damage.

46. On June 5, 2018, Ms. Stetson finally reached Ms. Galaviz. Ms. Stetson explained to Ms. Galaviz that, due to the dangerous nature of the damage, and the fact that no one from Auto-Owners made an effort to respond to Ms. Stetson's repeated messages to inspect the Property, 44th Avenue had no choice but to repair the damaged trusses. In addition, Ms. Stetson informed Ms. Galaviz that as required by the Policy, 44th Avenue had a duty to protect the Property from further damage. As a result, Ms. Stetson informed Ms. Galaviz that three of the four trusses had been repaired and the fourth was scheduled to be repaired on June 6.

47. Ms. Galaviz asked Ms. Stetson why the trusses had broken and Ms. Stetson responded that a determination had not been made. Ms. Galaviz responded that it was probably wear and tear and therefore not covered under the Policy.

48. On June 18, 2018, Ms. Galaviz, on behalf of Auto-Owners, issued a denial of coverage letter for Claim 2. In the letter, Ms. Galaviz claimed that she had spoken with Lisa Binkowski, a representative from CODA Construction. Ms. Binkowski allegedly stated that

damage to the trusses had been noticed on May 20, 2018 when a cut into the ceiling was made to install an HVAC system. Ms. Binkowski allegedly stated that she did not know how long the trusses had allegedly been broken.

49. Auto-Owners denied Claim No. 2 on the basis that the broken trusses did not constitute an "abrupt collapse." According to Auto-Owners, "an abrupt collapse means an abrupt falling down or caving in of the building." Auto-Owners further stated that "[b]ased on our investigation the building did not fall down or cave in…[and the Policy] does not cover any part of the building that is in danger of falling down or caving in."

50. Contrary to Ms. Binkowski's alleged statement, the breaking of the trusses was only discovered after furniture was being installed and the floor immediately began to visibly sink and shake. The breakage of the trusses in fact constituted an abrupt falling down and caving in of the floor as there had been no visible signs of any damage until that point.

51. Furthermore, at no time did Auto-Owners conduct a physical inspection of the Property, nor did it make any effort to physically inspect the Property, despite the dangerous and immediate nature of the damage. Auto-Owners failed to conduct a timely and reasonable investigation. Instead, the denial of Claim No. 2 was based upon nothing more than second-hand information.

52. In denying coverage for Claim No. 2, Auto-Owners intentionally misrepresented the language of the Policy, which provides coverage caused by an abrupt collapse of a building *or any part of a building that is insured.*

53. Notwithstanding Auto-Owner's knowledge of the specific policy language and the definition of the phrase "abrupt collapse," Auto-Owners gave 44th Avenue a knowingly false and misleading reason for the denial of coverage.

54. Auto-Owners

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

55. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

56. Plaintiff and Auto-Owners entered into a valid, binding and enforceable contract for insurance that covered the losses alleged herein.

57. The Policy was in full force and effect at the time of the Loss.

58. Plaintiff fully complied with all the provisions of the contract, including without limitation, paying premiums in a timely fashion and complying with all provisions governing notice of the claims and loss.

59. Defendant's denial of Plaintiff's claims constitutes a breach of the insurance contract and is a breach of Plaintiff's reasonable expectations concerning the coverage it would receive under the Policy.

60. Defendant's refusal to properly adjust the loss constitutes a breach of the insurance contract and is a breach of Plaintiff's reasonable expectations concerning the coverage it would receive under the Policy.

61. Defendant's failure to conduct a reasonable investigation, and failure to pay covered policy benefits constitute breaches of the insurance contract.

62. As a result of Defendant's breaches, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Bad Faith)

63. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

64. Plaintiff suffered losses covered by the Policy, and submitted claims for those losses to Defendant.

65. The claimed losses and damages submitted by Plaintiff are covered by the Policy and Plaintiff is owed covered benefits under the Policy.

66. Defendant owed the benefits referenced herein to Plaintiff under the Policy.

67. Defendant breached its duty to act reasonably and in good faith by, *inter alia*:

    a. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue in violation of C.R.S. § 10-3-114(1)(h)(I)

    b. Failing to act reasonably promptly upon communications with respect to claims arising under the Policy in violation of C.R.S. § 10-3-1104(1)(h)(II);

    c. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies in violation of C.R.S. § 10-3-1104(1)(h)(III).

    d. Refusing to pay claims without conducting a reasonable investigation based upon all available information in violation of C.R.S. § 10-3-1104(1)(h)(IV)

    e. Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonable clear in violation of C.R.S. § 10-3-11104(1)(h)(VI); and

8

    f. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement in violation of C.R.S. § 10-3-1104(1))(h)(XIV)

  68. Defendant overlooked material facts and an investigation would have produced relevant information.

  69. Defendant should have known that its conduct was unreasonable and Defendant recklessly disregarded the fact that its conduct was unreasonable.

  70. Defendant's conduct constitutes a breach of the covenant of good faith and fair dealing implied in every contract for insurance.

  71. Defendant's bad faith has caused Plaintiff to suffer and continue to suffer damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
### (Unreasonable Delay and Denial of Payment of Covered Benefits Pursuant to C.R.S. § 10-3-1115 and 10-3-1116)

  72. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

  73. Plaintiff suffered losses covered by the Policy, and submitted claims for those losses to Defendant.

  74. The claimed losses and damages submitted by Plaintiff are covered by the Policy and Plaintiff is owed covered benefits under the Policy.

  75. Defendant owed the benefits referenced herein under the Policy.

  76. Defendant denied payment of the covered benefits without a reasonable basis for its action.

  77. Defendant has failed to pay all of the benefits owed to Plaintiff under the Policy.

  78. Defendant's failure to pay the benefits owed under the Policy is without reasonable basis in violation of C.R.S. § 10-3-1115.

  79. Defendant's violation of C.R.S. § 10-3-1115 entitles Plaintiff to the remedies set forth in C.R.S. § 10-3-1116, including actual damages of two times the covered benefit, plus attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
### (Declaratory Relief Pursuant to C.R.C.P. Rule 57)

80. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

81. Plaintiff suffered losses covered by the Policy, and submitted claims for those losses to Defendant.

82. Defendant denied payment of the covered benefits.

83. Therefore, an actual and justiciable controversy presently exist between Plaintiff Defendant concerning the interpretation of the Policy.

84. Plaintiff seeks an order declaring the rights and obligations of the Plaintiff and Defendant under the Policy and declaring there is coverage for any benefits listed and/or endorsed under the policy;

85. Plaintiff seeks a declaration of the amount of the damages arising from the Loss and the amount of insurance benefits due and owing to Plaintiff from Defendant under the Policy.

## FIFTH CLAIM FOR RELIEF
(Violation of Colorado Consumer Protection Act, C.R.S. § 6-1-101, *et seq.*)

86. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

87. Defendant's conduct with respect to Plaintiff's claims including failure to make a fair and timely evaluation of claims, refusing to pay claims without conducting a reasonable investigation based on all available information, failure to implement and adopt effective standards to reasonably assure that claims that should be paid and would be paid and timely investigated in accordance with Colorado law constitutes violations of the Colorado Consumer Protection Act (CCPA), C.R.S. §6-1-101, *et seq.*

88. When Defendant became aware of facts which put it on notice that it did not comply with Colorado law and should have paid benefits to Plaintiff, it acted unreasonably and in violation of standards set forth within C.R.S. §10-3-1104(1)(a)(I) and (1)(h)(I-IV, VI, XIV).

89. The insurance contract issued by Defendant to Plaintiff created a reasonable expectation that Defendant would pay and evaluate claims in a reasonable manner in accordance with Colorado law.

90. Defendant unreasonably failed to pay claims in violation of Colorado law.

91. Upon information and belief, Defendant treats others similarly situated to Plaintiff in the same manner as they treated Plaintiff. This practice impacts the public.

92. Defendant, upon information and belief, unreasonably and unlawfully claims it has offered benefits to Plaintiff and those similarly situated in a manner that complies with Colorado law.

93. As a result of Defendant's violation of the CCPA, Plaintiff suffered injuries, damages and losses.

94. As a result of Defendant's violations of the CCPA, Plaintiff requests actual damages, three (3) times actual damages, attorney's fees, costs and interest pursuant to said act, more specifically C.R.S. § 6-1-113.

WHEREFORE, Plaintiff 44th Avenue Holdings Holdings, LLC, demands judgment in its favor and against Defendant Auto-Owners Insurance, and for such other and further relief as the Court deems just, including but not limited, to the following:

1. Declaratory judgment that there is coverage for Loss claimed by Plaintiff pursuant to the Policy;

2. All unpaid covered benefits under the Policy;

3. Damages resulting from Defendant's bad faith including out-of-pocket payments by Plaintiff, costs of ongoing damages resulting from Defendant's bad faith refusal to cover emergency and temporary repairs;

4. Statutory damages as set forth in C.R.S. § 10-3-1116(1);

5. Statutory damages as set forth in C.R.S. § 6-1-113.

6. Pre- and post-judgment interest and costs;

7. Attorneys' fees and costs; and

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 31st day of July, 2018.

Respectfully Submitted,

ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.

By: *s/ Patrick D. Vellone*
    Patrick D. Vellone
    Jennifer E. Schlatter
    1600 Stout Street, Suite 1100
    Denver, Colorado 80202
    (303) 534-4499
    E-mail: pvellone@allen-vellone.com
    E-mail: jschlatter@allen-vellone.com

ATTORNEYS FOR THE PLAINTIFF

PLAINTIFF'S ADDRESS:

7100 West 44th Avenue
Wheat Ridge, CO 80033